ORIGINAL

Approved:
ELISHA J. KOBRE/MARGARET GRAHAM
Assistant United States Attorneys

U.S. DISTRICT COURT
FILED
FEB 04 2019
S.D. OF N.Y.

Before:   HONORABLE HENRY PITMAN
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

        - v. -

ROBERT ALEXANDER,

                Defendant.

- - - - - - - - - - - - - - - - x

19MAG 221.

SEALED COMPLAINT

Violations of
18 U.S.C. §§ 2, 1343; 15
U.S.C. §§ 78j(b), 78ff; 17
C.F.R. § 240.10b-5

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

JOSEPH STRAWMAN, being duly sworn, deposes and says that he
is a Special Agent with the Federal Bureau of Investigation (the
"FBI"), and charges as follows:

## COUNT ONE
### (Securities Fraud)

1.    From at least in or about 2013 through in or about 2017,
in the Southern District of New York and elsewhere, ROBERT
ALEXANDER, the defendant, willfully and knowingly, directly and
indirectly, by the use of means and instrumentalities of interstate
commerce, the mails and the facilities of national securities
exchanges, in connection with the purchase and sale of securities,
did use and employ manipulative and deceptive devices and
contrivances, in violation of Title 17, Code of Federal
Regulations, Section 240.10b-5, by (a) employing devices, schemes
and artifices to defraud; (b) making untrue statements of material
facts and omitting to state material facts necessary in order to
make the statements made, in the light of the circumstances under
which they were made, not misleading; and (c) engaging in acts,
practices and courses of business which operated and would operate
as a fraud and deceit upon persons, to wit, ALEXANDER solicited
investments in Kizzang, LLC ("Kizzang"), an online gaming company
founded   and   operated   by   ALEXANDER,   through   fraudulent

misrepresentations and, after obtaining investor funds, misappropriated those funds for his personal use.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT TWO
### (Wire Fraud)

2. From at least in or about 2013 through in or about 2017, in the Southern District of New York and elsewhere, ROBERT ALEXANDER, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, and attempting to do so, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, ALEXANDER solicited investments in Kizzang through fraudulent misrepresentations and, after obtaining investor funds, misappropriated those funds for his personal use.

(Title 18, United States Code, Sections 1343 & 2.)

The bases for my knowledge and for the foregoing charge are, in part and among other things, as follows:

3. I have been a Special Agent with the FBI since approximately 2016. I am currently assigned to a squad within the New York Division responsible for investigating violations of federal securities laws and related offenses. I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, including my examination of reports and records, interviews I have conducted, and conversations with other law enforcement officers and other individuals. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, unless noted otherwise.

## RELEVANT ENTITIES AND INDIVIDUALS

4.     At   all   times   relevant   to   this   Complaint,   ROBERT
ALEXANDER, the defendant, was the founder and president of Kizzang.
ALEXANDER's LinkedIn profile states that from in or about 1998 to
2000,  ALEXANDER  was  on  the  Board  of  Directors  of  a  company
described on its website as "a leading developer, publisher and
marketer  of  interactive  entertainment  for  consumers  around  the
globe"  (the  "Interactive  Entertainment  Company").    According  to
Kizzang  investor  materials  distributed  by  ALEXANDER,  he  has
"driven the success of some of the world's most notable video games
including" a particular well-known video game (the "Video Game")
published  by  a  wholly-owned  subsidiary  of  the  Interactive
Entertainment Company (the "Video Game Company").

5.     At all times relevant to this Complaint, Kizzang was a
Nevada limited liability corporation established in or about 2013
and headed by ROBERT ALEXANDER, the defendant.   Kizzang marketed
itself as being in the business of offering free online gaming and
contests.  As of at least in or about the summer of 2017, Kizzang
had ceased operations.

6.     At all times relevant to this Complaint, Sentinel Growth
Fund Management ("Sentinel") was an investment fund with offices
in Stamford, Connecticut and New York, New York.  Sentinel was co-
founded  by  a  particular  individual  ("Individual-1").    Through
Individual-1, Sentinel invested more than $2.2 million of investor
funds in Kizzang. As of the date of this Complaint, neither
Sentinel nor its investors have received the principal or any
return on this investment.  On February 1, 2017, Individual-1 pled
guilty,  pursuant  to  a  cooperation  agreement,  to  conspiracy  to
commit securities fraud and wire fraud, securities fraud, and wire
fraud in connection with a scheme to defraud Sentinel investors.[1]

7.     At all times relevant to this Complaint, a particular
individual  ("Individual-2")  worked  to  solicit  investments  into
Sentinel through, among other means, pitching wealthy individuals
and representatives of wealthy private families to invest.   Both
Individual-1 and Individual-2 also assisted ROBERT ALEXANDER, the
defendant,  in  soliciting  investments  in  Kizzang.    On  October  30,
2017, Individual-2 pled guilty to conspiracy to commit securities

---

[1] Individual-1 also pled guilty to a separate count of wire fraud
in connection with a scheme to defraud investors in a different
hedge fund.  Information provided by Individual-1 has proven to be
accurate and reliable and has been corroborated by, among other
things, bank records and emails, as further described below.

3

fraud and wire fraud in connection with a scheme to defraud investors in Sentinel.

## OVERVIEW OF THE FRAUDULENT SCHEME

8.    As set forth below, ROBERT ALEXANDER, the defendant, engaged in a scheme to defraud investors in Kizzang.  Specifically, ALEXANDER solicited and maintained investments in Kizzang through numerous false misrepresentations, including concerning his own professional background, Kizzang's financial condition, expected returns on investment, and through false assurances to investors that their investments would be used solely for Kizzang's business purposes.

9.    Also in furtherance of his scheme and contrary to representations made to investors, ROBERT ALEXANDER, the defendant, used a substantial portion of the funds he obtained from investors on his own personal expenses instead of for Kizzang's business purposes.  For example, ALEXANDER used investor funds to make payments toward ALEXANDER's personal credit cards, to fund ALEXANDER's gambling excursions to multiple casinos, to make rental payments for his personal residence, and to make car payments for a luxury car purchased for one of ALEXANDER's family members.

## THE FRAUDULENT SCHEME

10.    From my interview of the co-founder and chief investment officer (the "Victim-1 Representative") of a family controlled investment entity located in New York, New York ("Victim-1"), and from emails and other documents provided by the Victim-1 Representative, I have learned among other things, the following:

a.    In or about January 2015, Individual-2 began soliciting an investment from Victim-1 in Kizzang.  On or about February 6, 2015, Individual-2 sent the Victim-1 Representative a Kizzang investor presentation, dated January 2015 (the "January 2015 Presentation"), and a "Financing Summary Term Sheet," also dated from January 2015 (the "January 2015 Term Sheet").  As described in the January 2015 Presentation:

i.    Kizzang was a "digital sweepstakes" company that is "revolutionizing the sweepstakes business" by "bringing sweepstakes into the modern, digital age."  Kizzang's digital sweepstakes offerings are available "on the Web, via Facebook, and will soon be coming to mobile devices," and included games such as "scratch cards, parlay cards, and slot tournaments that appeal to

the mass market." Kizzang earned revenue "via sponsorships, custom sweepstakes, affiliate marketing, and data mining"; and

    ii.  ROBERT ALEXANDER, the defendant, was the "manager" of Kizzang. ALEXANDER had "driven the success of the world's most notable video games including," the Video Game.

    b. As set forth in the January 2015 Term Sheet, Kizzang sought to raise $5.4 million by offering Class E shares of Limited Liability Company ("LLC") Membership Interests in Kizzang at $.75 per share. A section of the January 2015 Term Sheet titled "Use of Net Proceeds" represented that "[t]he net proceeds from this financing will be used" on "General and Administrative Expenses," "Market Launch and Advertising," "Technology and Development" and "Operating Reserves." A section titled "Management" stated that the "Company is managed by Robert Alexander" who "has complete control over all management of the Company."

    c. In or about the summer of 2015, prior to investing in Kizzang, the Victim-1 Representative spoke with ALEXANDER. Among other things, ALEXANDER told the Victim-1 Representative, in sum and substance, that Victim-1's investment would be used solely for the development of Kizzang's gaming applications. As further set forth below, based upon my review of Kizzang bank records, I have learned that this was false. ALEXANDER further told the Victim-1 Representative that Victim-1 would receive a guaranteed return of ten times Victim-1's investment.

    d. From emails obtained from an email account used by Individual-1 in connection with Sentinel (the "Individual-1 Email Account"), I have learned that, on or about August 18, 2015, an assistant to the Victim-1 Representative emailed ALEXANDER, copying the Victim-1 Representative, seeking certain additional financial information about Kizzang. ALEXANDER forwarded this email to Individual-2 and Individual-1. At or about 8:42 a.m., Individual-2 replied to ALEXANDER: "On with [the Victim-1 Representative] as we speak . . . waivering between $500k / $1m . . ." ALEXANDER replied, copying Individual-1, "Min 10 times $$"; "Get Originate [sic] monies back jan"; and "Need high."

    e. On or about August 21, 2015, Victim-1 invested a total of approximately $1 million in exchange for approximately 1,333,334 Class E Shares and a Warrant to receive 200,000 Class E Shares. From my interviews with the Victim-1 Representative and from reviewing bank records for a bank account in the name of Kizzang over which ALEXANDER had signatory authority ("Kizzang Account-1"), I have learned that Victim-1 wired $100,000 of the

investment on or about August 26, 2015 and the remaining $900,000 of the investment on or about September 11, 2015.

f.   Following Victim-1's investment in Kizzang, ALEXANDER told the Victim-1 Representative that the return of Victim-1's principal investment would be delayed due to liquidity issues and because a private equity investor ALEXANDER had represented was going to invest was busy working on other deals. ALEXANDER told the Victim-1 Representative that the name of the private equity investor was confidential. Despite repeated requests, Victim-1 never received the return of its principal or any return on its investment.  Ultimately, in or about May 2017, Victim-1 sold its shares in Kizzang for $.25 on the dollar.

g.   Following Victim-1's investment, the Victim-1 Representative met with ALEXANDER at Victim-1's office in Manhattan on or about December 3, 2015 (the "December 2015 Meeting").  From an audio recording of the December 2015 Meeting made by the Victim-1 Representative, I have learned that during this meeting, ALEXANDER stated the following, in substance and in part:

i.   ALEXANDER invested $5 million of his own money in Kizzang.

ii.   The round of financing in which Victim-1 made its investment included a $3 million investment from an investor from California who owns a very big hedge fund.

iii.   A well-known sweepstakes company (the "Sweepstakes Company") had offered to purchase Kizzang for $160 million.

11.   Based on my review of bank records for Kizzang, my interview with a representative of the Sweepstakes Company and my review of records provided by the Sweepstakes Company, I have learned that these statements made by ROBERT ALEXANDER, the defendant, to the Victim-1 Representative during the December 2015 Meeting were false as set forth below.

12.   From my review of Kizzang's bank records,[2]   I have learned that (a) ROBERT ALEXANDER, the defendant, contributed no

---

[2] I believe that I have identified all of the bank accounts used by Kizzang based, among other things, on my review of a Kizzang balance sheet dated March 31, 2015 listing Kizzang's assets; my

money to Kizzang; and (b) no investment into Kizzang of $3 million or, indeed, any substantial sum, was made by a California-based hedge fund owner.

13.   From an interview with the Vice President and General Manager of Digital Operations of the Sweepstakes Company (the "Sweepstakes Company VP") and my review of records provided by the Sweepstakes Company, I have learned that (a) the Sweepstakes Company VP met once with ALEXANDER and concluded immediately that the Sweepstakes Company would not do business with ALEXANDER; and (b) the Sweepstakes Company never made any offer to purchase Kizzang, let alone an offer of $160 million.

14.   Additionally, based on my review of bank records for Kizzang Account-1, I have learned that, contrary to the representations ROBERT ALEXANDER, the defendant, made to the Victim-1 Representative, ALEXANDER did not use Victim-1's investment solely for business purposes of Kizzang. Specifically, the Kizzang Account-1 bank records reflect the following:

a.   On or about August 26, 2015, the date Victim-1 wired the first $100,000 of its investment to Kizzang Account-1, that account had a balance of approximately $3,553.

b.   On or about September 11, 2015, the date Victim-1 wired its additional $900,000 investment to Kizzang Account-1, that account had a balance of approximately $167.06.

c.   Upon receipt of Victim-1's funds into Kizzang Account-1, ALEXANDER used Victim-1's funds to make payments of more than $71,000 to personal credit cards in ALEXANDER's name; to make payments of more than approximately $11,000 on  tuition payments for a culinary school for a close family member of ALEXANDER's ("ALEXANDER's Family Member"); to make payments to BMW Financial Services for a luxury car purchased by ALEXANDER's Family Member; to make rental payments for ALEXANDER's personal residence; to repay a $20,000 debt to Sentinel; and to make a $25,000 payment to an individual who was a prior investor in Kizzang.[3]

---

review of accounts reflecting the receipt and disbursement of investments by all identified Kizzang investors; and my review of records provided in response to broad subpoenas to banks used by Kizzang.

[3] During the approximately two-month period from Victim-1's

15.  From my interview with another individual (the "Victim-2 Representative") who served as Chief Executive Officer of a family controlled investment entity ("Victim-2") and emails and other documents provided by the Victim-2 Representative, I have learned the following, among other things:

a.  In or about February 2016, ROBERT ALEXANDER, the defendant, solicited the Victim-2 Representative to cause Victim-2 to invest in Kizzang.

b.  Specifically, on or about February 10, 2016, Individual-2, whom the Victim-2 Representative had met in late 2015 or early 2016, emailed the Victim-2 Representative an investor presentation regarding Kizzang.

c.  On or about February 11, 2016, ALEXANDER emailed the Victim-2 Representative a Kizzang "Financing Summary Term Sheet" dated February 1, 2015 for a proposed offering of Class E Shares of LLC Membership Interests in Kizzang (the "February 2016 Term Sheet").[4]  Like the January 2015 Term Sheet provided to the Victim-1 Representative, the January 2016 Term Sheet specified that the proceeds from this financing would be utilized entirely for "General Corporate Purposes, product, Development, Working Capital"; "Facebook Marketing"; and "Licensing Fees."

d.  On or about February 18, 2016, the Victim-2 Representative met with ALEXANDER and others from Kizzang. ALEXANDER told the Victim-2 Representative that he had invested

---

transfer of the first $100,000 of its investment on or about August 26, 2015 through on or about October 31, 2015 the only substantial inflows of funds into Kizzang Account-1 were a $200,000 investment on or about September 16, 2015 from another victim-investor; $20,000 on or about September 4, 2015 from an entity which I believe, based upon information from Individual-1 and a LinkedIn profile, was the brother of a Kizzang employee; and $8,000 from an individual I have learned from Individual-1 was a friend of ALEXANDER's and possibly an investor in Kizzang.

[4] I believe the date on this term sheet is a typographical error and that the term sheet should be dated February 1, 2016.  My belief in this regard is based on the file name of the term sheet ALEXANDER sent to Victim-2 on this date, which is "Class E Term Sheet Feb 2016.doc" and the fact that this document was sent to Victim-2 in February 2016.

several million dollars of his own money into Kizzang and that he had already raised $10 million in investments in Kizzang. A Kizzang investor presentation dated February 2016 (the "February 2016 Presentation") and later provided to the Victim-2 Representative likewise stated that Kizzang had already raised over $10 million in investments.

16. From my review of bank records for Kizzang's bank accounts, I believe that the statements made by ROBERT ALEXANDER, the defendant, to the Victim-2 Representative were false. In particular, Kizzang's bank records do not reflect any investment in Kizzang by ALEXANDER and further that, by February 2016, Kizzang had raised at most, but likely less than, $7.7 million in investments.

17. From my interview with the Victim-2 Representative, I have also learned, among other things, that after learning of the Victim-2 Representative's interest in philanthropy, ROBERT ALEXANDER, the defendant, told the Victim-2 Representative that ALEXANDER had previously donated $50 million to help build the prenatal wing of a particular prominent California hospital (the "Hospital").

18. From my review of correspondence from the Hospital, I have learned that the Hospital could find no record of any donation or contribution by ROBERT ALEXANDER, the defendant, to the Hospital.

19. From my interview with the Victim-2 Representative, I have also learned, among other things, that ROBERT ALEXANDER, the defendant, also told the Victim-2 Representative that ALEXANDER had created the Video Game.

20. From my interview with the co-founder and vice president of the Video Game Company (the "Video Game Company Co-Founder"), I have learned that, in fact, ROBERT ALEXANDER, the defendant, had no role with the Video Game Company and had no involvement in the production of the Video Game.[5]

21. From my interview with the Victim-2 Representative, I have also learned, among other things, that ROBERT ALEXANDER, the defendant, also told the Victim-2 Representative that Kizzang was

---

[5] According to the Video Game Company Co-Founder, ALEXANDER worked for the Interactive Entertainment Company, the parent company of the Video Game Company. In that role, ALEXANDER was involved only in the distribution and sale of games.

guaranteed to have its revenues meet or exceed its expenses within three years.    ALEXANDER  further  represented  that  Victim-2's investment would be used solely for Kizzang's business expenses. Based  on  these  representations,  Victim-2  decided  to  invest  in Kizzang.

22.   Based on my review of Kizzang bank records and records provided by the Victim-2 Representative, I have the learned the following:

a.   On or about February 26, 2016, Victim-2 wired an investment  of  approximately  $501,000  to  Kizzang  Account-1  in exchange for 668,000 Class E Shares of Kizzang stock.   The ending daily balance of Kizzang Account-1 the day before Victim-2 wired its investment was a negative balance of $1,627.43.

b.   Contrary  to  the  representations  made  by  ROBERT ALEXANDER,  the  defendant,  Victim-2's  investment  was  not  used solely  for  Kizzang's  business  purposes.    Records  for  Kizzang Account-1 indicate that ALEXANDER used Victim-2's investment to, among other things, make approximately $31,000 in payments towards ALEXANDER's personal credit cards and approximately $3,800 in rent payments for ALEXANDER's residence.

23.   From my interview with the Victim-2 Representative and emails   and   other   documents   provided   by   the   Victim-2 Representative,  I  have  also  learned  the  following,  among  other things.

a.   On or about June 30, 2016, ROBERT ALEXANDER, the defendant, sent Victim-2 and other Kizzang shareholders a letter stating, among other things, that Kizzang was "looking to raise an additional $15 Million in capital" and that "[t]his additional funding  support  our  contest  Insurance  premiums,  Marketing (Social, TV, and print) licensing fees, product development and working  capital."    In  reply  to  an  inquiry  by  the  Victim-2 Representative  regarding  the  need  for  additional  capital, ALEXANDER sent an email to the Victim-2 Representative on or about July 1, 2016 stating, in pertinent part, "Licensing, building new content, Insurance costs for larger prizes and Marketing (TV, and Social) are the main reasons for the new needed influx of capital."

24.   A  review  of  bank  records  for  Kizzang  Account-1 indicates that on July 1, 2016, the same day that ROBERT ALEXANDER, the defendant,  sent  this  email  to  the  Victim-2  Representative, ALEXANDER used more than $1,300 in Kizzang investor funds at an adult  entertainment  establishment  and  approximately  $1,248  in

investor funds in payment for a luxury car purchased by ALEXANDER's Family Member.

25.   From my interviews of Individual-1, my review of emails from the Individual-1 Email Account, and my review of bank records for Kizzang Account-1, I have learned the following among other things:

a.   In or about the fall of 2014, Individual-1 was introduced to ROBERT ALEXANDER, the defendant.  During a meeting with ALEXANDER, ALEXANDER solicited Individual-1 to invest in Kizzang.  ALEXANDER demonstrated Kizzang's website for Individual-1 and told Individual-1 that Kizzang's revenue would come from advertising and paid promotions.   ALEXANDER told Individual-1 there was already $10 million invested in Kizzang, some of which was ALEXANDER's personal money.  As noted above, based upon my review of Kizzang's bank records, I believe this was false.

b.   From in or about September 2014 through in or about November 2016, Individual-1 invested a total of approximately $2,278,000 of Sentinel investor funds in Kizzang via wire transfer to Kizzang Account-1.  On or about September 26, 2016, Individual-1's wife also invested $70,000 in Kizzang.

c.   ALEXANDER told Individual-1 that Sentinel's investment would be used solely for Kizzang business expenses, primarily for payroll and marketing.  From my review of records for Kizzang Account-1, I have learned that this was false and that ALEXANDER used Sentinel investor funds on a host of personal expenses including ALEXANDER's personal credit card and casino gambling.  ALEXANDER further told Individual-1 that he, ALEXANDER, did not receive a salary from Kizzang.

d.   ALEXANDER told Individual-1 that he had earned substantial wealth earlier in his career by being a significant contributor to the Video Game.  As noted above, from my interview with the Video Game Company Co-Founder, I believe that ALEXANDER had no role in creating the Video Game.   ALEXANDER also told Individual-1 that he at one point had hundreds of millions of dollars which he had to pay the Internal Revenue Service ("IRS").  Before starting Kizzang, ALEXANDER was a successful professional gambler.

e.   On or about November 13, 2017, ALEXANDER sent a letter to Kizzang investors, including Individual-1, stating that "Kizzang has been inactive for the past 5 months and is hopelessly

11

insolvent." Neither Sentinel nor its investors have ever received the principal or any return on its investment.

26.   From an interview with a former stock broker who was asked by a friend to evaluate Kizzang as a potential investment (the "Broker"), records provided by the Broker, and emails from the Individual-1 Email Account, I have learned, among other things, the following:

a.   In or about 2015, a friend of the Broker who was considering investing in Kizzang asked the Broker to conduct due diligence on Kizzang.  On or about May 30, 2015, the Broker met with ROBERT ALEXANDER, the defendant, regarding Kizzang.  During this meeting, ALEXANDER described Kizzang as being modeled on the Sweepstakes Company but using new technology.  ALEXANDER stated that Kizzang had a value of $70 million and that ALEXANDER owned 60% of the company based on his having invested $3 million. ALEXANDER provided the Broker with a July 2015 "Investor Presentation" (the "July 2015 Presentation").

b.   On or about June 24, 2015, ALEXANDER sent an email to the Broker responding to certain questions the Broker had posed about Kizzang's financial condition (the "June 24, 2015 Email"). ALEXANDER attached to this email a document titled "Kizzang Balance Sheet As of March 31, 2015" (the "2015 Kizzang Balance Sheet"). The 2015 Kizzang Balance Sheet referenced, among other things, that Kizzang Account-1 (identified on the Kizzang Balance Sheet by the last four digits in its account number) had current assets of $1,559,082.13.  However, as reflected in bank records for Kizzang Account-1, the ending daily balance in that account on March 31, 2015 was only $58,064.38 and the account had an average balance in March 2015 of only approximately $65,507.

c.   ALEXANDER also attached to the June 24, 2015 Email an excel spreadsheet named "2013 and 2014 TE.xls" (the "2013/2014 TE Spreadsheet") purporting to list Kizzang's legitimate travel and entertainment business expenses.  Some of the entries in the 2013/2014 TE Spreadsheet were false including the following:

i.   The 2013/2014 TE Spreadsheet listed an expense on or about April 16, 2013 of $18,630 for "Moving Expenses David." However, (a) records for Kizzang Account-1 and another principal Kizzang bank account ("Kizzang Account-2," and together with Kizzang Account-1, the "Kizzang Accounts") do not reflect any payments for moving related expenses on or about April 16, 2013; while (b) records for Kizzang Account-2 reflect two check card

purchases totaling $18,630 on or about April 14 and 15, 2013 at a casino in Las Vegas ("Casino-1").

ii.    The 2013/2014 TE Spreadsheet lists an expense on or about December 30, 2013 of $18,952 for "Moving Expenses Vincent."  Records for the Kizzang Accounts however: (a) do not reflect any payments for moving related expenses on or about December 30, 2013; while (b) records for Kizzang Account-2 reflect check card purchases totaling $18,952 on or about December 29 and 31, 2013 at a casino in Las Vegas ("Casino-2").

27.    From an interview with another individual who invested in Kizzang in or about December 2013 ("Victim-3"), I have learned that ROBERT ALEXANDER, the defendant, met with Victim-3, described Kizzang, and solicited an investment in Kizzang.  From my review of bank records for Kizzang Account-2, I have learned that, on or about December 26, 2013, Victim-3 wired an investment of $25,000 in Kizzang.  At the time Victim-3 wired this investment, Kizzang Account-2 had a balance of approximately $488.98.  Three days later, on or about December 29, 2013, a check card purchase from Kizzang Account-2 was made at Casino-2 in the amount of $9,476. Records from Casino-2 reflect a gambling loss by ALEXANDER on or about December 29, 2013 of approximately $9,200.

28.    From an interview with the Senior Vice President of Engineering for Kizzang (the "SVP of Engineering"), I have learned, in sum and substance, the following:

a.    ROBERT ALEXANDER, the defendant, told the SVP of Engineering that he played a significant role in developing the Video Game.  As noted above, from my interview with the Video Game Company Co-Founder, I believe that ALEXANDER had no role in creating the Video Game.

b.    The SVP of Engineering observed ALEXANDER at a meeting of Kizzang investors pretend to be on the phone with a wealthy well-known businessman as a way of increasing his status among investors.

c.    ALEXANDER told the SVP of Engineering that he had made millions of dollars from a lawsuit against ALEXANDER's former employer.  From publicly available court filings, I have learned that ALEXANDER sued the Interactive Entertainment Company in the United States District Court for the District of Nevada for, among other things, violating ALEXANDER's employment agreement, and that this lawsuit was dismissed with prejudice.

13

29.   From my review of records for the Kizzang Accounts, I have learned that, from in or about 2013 through in or about 2017, ROBERT ALEXANDER, the defendant, utilized an aggregate total of at least approximately $1,328,506 of Kizzang investor funds for his personal use including, among other things, approximately: $579,265 on personal credit cards in ALEXANDER's name; $279,631 in cash withdrawals at various casinos; $110,194 on rental payments for his personal residence; $50,000 to settle a lawsuit against ALEXANDER unrelated to Kizzang;[6] $28,067 in culinary school tuition payments for ALEXANDER's Family Member; $25,104 on payments for the lease of a luxury car for ALEXANDER's Family Member; $44,809 on various entertainment expenses including amusement parks, adult entertainment venues, spas, and more than $1,500 for a Las Vegas night club birthday party for ALEXANDER's Family Member.[7]

30.   From my review of personal tax returns filed by ROBERT ALEXANDER, the defendant, for tax years 2013 through 2016, I have learned, among other things, that ALEXANDER did not report receiving any wages or compensation from Kizzang in tax year 2013; reported only $42,456 in wages and compensation from Kizzang in each of tax years 2014 and 2015; and reported no wages or compensation from Kizzang in 2016.

---

[6] From my review of records for Kizzang Account-2, I have learned that, on or about April 1, 2013, ALEXANDER transferred $50,000 to the attorney trust account of a particular law firm (the "Law firm Trust Account").   From my review of documents filed in the United States Bankruptcy Court for the District of Nevada, I have learned the following regarding this payment:   In or about 2009, a judgment was entered against ALEXANDER in the United States District Court for the District of Minnesota in a civil lawsuit unrelated to Kizzang (the "Lawsuit").   In or about May 2012, in connection with a personal bankruptcy proceeding filed by ALEXANDER in the District of Nevada, ALEXANDER agreed to settle the Lawsuit in exchange for, among other things, payment of $50,000 on or before April 1, 2013 to the Law firm Trust Account.

[7] Bank records for Kizzang also reflect cash withdrawals at automated teller machines ("ATMs") (not including check card purchases at casinos) totaling $696,206 and cash deposits totaling $684,489.   The $696,206 in ATM cash withdrawals are not included in the amount listed in this paragraph as having been misappropriated by ALEXANDER.

14

WHEREFORE, deponent prays that an arrest warrant be issued for ROBERT ALEXANDER, the defendant, and that ALEXANDER be imprisoned or bailed, as the case may be.

JOSEPH STRAWMAN
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
4th day of February 2019

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

15